# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

KATHLEEN A. CARTER, as parent and
natural guardian and next friend of
DAVID ANTHONY PERFETTI, a minor

    Plaintiff,

v().                                                                                                     No. CIV 00-0341 WJ/RLP

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,

    Defendant/ Third-Party Plaintiff,

v.

ERNEST AUERBACH, LISA D. AUERBACH,
PIERRE AMESTOY and NEW MEXICO STUD, INC.

    Third Party Defendants.

## MEMORANDUM OPINION AND ORDER DENYING
## THIRD PARTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court pursuant to Third Party Defendants' Ernest Auerbach and Lisa D. Auerbach's Motion for Summary Judgment [Docket No. 151]. For the reasons stated below, the motion is denied.

**PROCEDURAL AND FACTUAL HISTORY**

Plaintiff Kathleen Carter, as parent and next friend of David Anthony Perfetti (David), filed a Complaint against The Burlington Northern and Santa Fe Railway Company (BNSF). David's father, Anthony Perfetti, died in a collision between the vehicle in which he was traveling and a train. Plaintiff filed her complaint alleging that BNSF had, among other things, negligently maintained a crossing, negligently operated a train, and failed to provide adequate warning

devises. The estate of Anthony Perfetti was joined as an involuntary plaintiff to this action.

The crossing at which Mr. Perfetti was killed was a private crossing in that it permitted access to private property. The property that was accessed by this particular crossing could not be accessed by any other means. The railway itself is property belonging to BNSF. Thus, the crossing itself is also property belonging to BNSF.

In 1981, the railway was operated and owned by the Atchison, Topeka and Santa Fe Railway Company (ATSF). The private property which could only be accessed by crossing the railway was at that time owned by Pierre Amestoy as agent for New Mexico Stud, Inc. ATSF entered into an "Agreement for Private or Farm Crossing" with Amestoy. A copy of the agreement is attached to the Memorandum in support of the motion [Docket No. 152] as Exhibit A. By this agreement, ATSF gave Amestoy permission to cross the railway. The agreement specifies that Amestoy is obligated to indemnify ATSF for all claims, demands, actions, or causes of action arising out of loss, damage, injury, or death resulting from the use of the crossing. The agreement specifies in several places that the permission is a license. It also specifies that the license is personal to Amestoy. ATSF reserved the right to terminate the license upon ten days notice in writing, and specified that all rights to use the crossing would absolutely cease upon expiration of the time specified in a notice of termination. Finally, the agreement stated that all provisions of the agreement shall bind the successors and assigns of the parties, but that Amestoy could not assign his rights under the agreement without written consent from ATSF.

At some point subsequent to the agreement, BNSF became the successor of ATSF. In 1985, Amestoy obtained loans secured by mortgages on the property. Mr. Auerbach guaranteed the loans and took a real estate contract on the property as security for his guarantee. Amestoy

defaulted on his loans and Auerbach took title to the property in February 1987. The evidence is undisputed that, after the Auerbachs took possession of the property, they became aware of ATSF's ownership of the railway crossing.

It is also clear that, while there was communication between the parties about a new agreement, no new crossing agreement was ever signed by the Auerbachs. The evidence shows that the Auerbachs explored the idea of developing their property in 1989. During this time, the Auerbachs or their agents met with and discussed the crossing with agents for ATSF on at least one occasion. In 1990, ATSF sent the Auerbachs a letter and a new crossing agreement for widening the existing crossing for the proposed development. This communication and proposed agreement show definitively that the crossing required permission from ATSF and that such permission required an agreement by the Auerbachs to indemnify ATSF. In 1994, ATSF sent a letter to Auerbach Financial, Inc. asking that a new agreement be executed by the Auerbachs. While the Auerbachs never entered into a new crossing agreement with ATSF or BNSF, the Auerbachs continued to use the crossing to access their property.

BNSF filed third-party claims against Pierre Amestoy, New Mexico Stud, Inc., Ernest Auerbach, and Lisa D. Auerbach seeking indemnification based on the indemnification clause in the 1981 agreement. The Auerbachs filed the instant motion for summary judgment. They first argue that they are not bound by the 1981 agreement because they did not have notice of it at the time they acquired the property in accordance with the New Mexico real property recording statutes. The Auerbachs also argue that the 1981 agreement cannot hold the Auerbachs to indemnify the railway for negligent design of the crossing because this would be contrary to New Mexico law found at N.M. Stat. Ann. 1978 § 56-7-1. Finally, the Auerbachs argue that any

assignment of the agreement from Amestoy to the Auerbachs is void because neither ATSF nor BNSF consented in writing to the assignment.

BNSF responds to the Auerbachs first argument by stating that the Auerbachs, as successors in interest to Amestoy, are bound by the 1981 agreement between ATSF and Amestoy because the agreement specifies that the agreement will bind Amestoy's successors and assigns. BNSF urges that the Auerbachs had notice of the agreement because the crossing is apparent and the Auerbachs should have known that it was owned by the railway company. Thus, they urge that the Auerbachs had actual notice, constructive notice or were on inquiry notice of the 1981 agreement. BNSF alternatively contends that the Auerbachs are bound by the 1981 agreement because, in 1994, ATSF notified the Auerbachs that the 1981 agreement would continue in force until the Auerbachs signed a new agreement. Finally, BNSF argues that the Auerbachs are bound by the indemnification provisions of the proposed agreement because they had notice that the crossing was owned by ATSF or BNSF, they had notice that a new agreement was required for continued use of the crossing, and the Auerbachs continued to use the crossing in spite of not signing a new agreement. BNSF asserts that the continued use was an acceptance of the offer of a license. Alternatively, BNSF urges that the continued use estops the Auerbachs from denying the burdens of the agreement when they reaped the benefits.

BNSF responds to the Auerbachs second argument by stating that the design exclusion from the indemnification requirement cannot shield the Auerbachs from liability in this case because the complaint does not allege negligent design. BNSF counters the Auerbachs' third argument by stating that the consent requirement for assignment of the agreement was for the sole benefit of ATSF or BNSF and can thus be waived by the company; Amestoy's assignees cannot

4

attack the validity of the assignment based on the company's having not consented to the assignment.

**LEGAL STANDARDS**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Worrell v. Henry, 219 F.3d 1197, 1204 (10th Cir. 2000). In ruling on a motion for summary judgment, a Court does not weigh the evidence, but determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Jeffries v. State of Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998). In making this determination, the Court must construe all the facts in the record and reasonable inferences that can be drawn from those facts in a light most favorable to the nonmoving party. Worrell, 219 F.3d at 1204; Jeffries, 147 F.3d at 1228.

**DISCUSSION**

I.  THE INDEMNIFICATION LIMITATION OF N.M. STAT. ANN. 1978 § 56-7-1

"Rider A" to the 1981 agreement, by its terms, incorporates the limitations on indemnification found in N.M. Stat. Ann. 1978 § 56-7-1. This statute voids, as a matter of law, any indemnification agreement regarding the maintenance, modification, or improvement of real property unless the indemnification agreement excludes liability arising out of the preparation of designs or specifications of the indemnitee or the giving of instructions by the indemnitee. The Auerbachs argue that Plaintiff's Complaint raises claims of negligent design and negligent implementation of design features and that Rider A excludes liability for these in the indemnification provision of the agreement. BNSF responds that the Complaint does not raise

5

claims for negligent design or negligent design implementation. Additionally, the limitations of Section 56-7-1 and Rider A are not as broad as the Auerbachs state in that they do not exclude liability for design implementation.

BNSF's reading of Rider A and Section 56-7-1 is accurate. Additionally, the Complaint, on its face, does not allege that the railway crossing was negligently designed. Thus, the Auerbachs are not entitled to summary judgment on the basis of the limitations found in Rider A of the 1981 agreement.

II.  THE FAILURE OF AMESTOY TO GET WRITTEN CONSENT FROM THE RAILWAY COMPANY TO ASSIGN HIS RIGHTS UNDER THE 1981 AGREEMENT

At the outset, it is not clear that there was any assignment by Amestoy of the 1981 agreement. However, this issue is addressed below. Assuming, *arguendo*, that there was an assignment, the Auerbachs argue that the assignment was void because ATSF did not give written consent to the assignment.

The Auerbachs cite to Wyrsch v. Milke, 585 P.2d 1098, 1101 (N.M. App. 1978), for the proposition that a contractual provision requiring written consent to an assignment is a condition precedent to the validity of an assignment and, absent the required consent, the assignment is invalid. In Wyrsch, Mr. Milke purchased a business from Mr. Adams. Mr. Adams financed at least a portion of the purchase. Thus, the purchase contract contained a provision that Milke would not convey the business without the prior written consent of Adams. Nearly two years later, Milke entered into a contract with Wyrsch to sell the business. This contract was specifically contingent on Milke obtaining Adams' written consent to the conveyance. Wyrsche began operating the business, but Adams never consented to the conveyance of the business from

Milke to Wyrsche. Milke then defaulted on its payment obligations to Adams. Adams refused to accept payment from Wyrsche. Wyrsche then sued Milke for rescission of the contract. The court found that the agreement between Milke and Wyrsche was contingent upon Adams' consent. Id. at 1101. The Court stated that, "If an agreement is made subject to the consent of an additional party, it must be viewed as conditional and if the consent is not given, the agreement is not binding." Id. (internal citations omitted).

BNSF points out that this case is distinguishable from Wyrsche and that the holding in Wyrsche has been limited. In this case, as in Wyrsche, there was a clause in a contract between the original parties that required consent to an assignment. In Wyrsche, however, the contract between the subsequent purchaser and one of the original parties was unambiguously contingent on obtaining the consent that was required by the original contract. In our case there was no agreement between Amestoy and Auerbach that was specifically and unambiguously contingent on the consent of the railway company. Therefore, the reasoning of the state court in Wyrsche is inapplicable to this case. This is made clear in Evatt v. Steele, 783 P.2d 959 (N.M. 1989).

In Evatt, the Evatts owned a hardware store. They had a contract with a bank for the lease of a computer in the store. This contract provided that the Evatts could not assign the lease without prior written approval from the bank. The Evatts sold the store to the Steeles. In selling the store, the Evatts also assigned the computer lease to the Steeles. The Evatts did not obtain the bank's consent to the assignment. Seven months later, the computer broke. The Steeles stopped making the payments on the lease and notified the Evatts to take possession of the computer. The Evatts took possession of the computer and completed the payments under the lease. The Evatts then sued the Steeles. The Steeles argued that the assignment of the lease

7

agreement was void because the bank had not consented to the assignment. The court found that the bank's consent was not a condition precedent to the formation of the assignment agreement between the Evatts and the Steeles. Id. at 960.

In accordance with Evatt, the consent clause in the 1981 agreement between ATSF and Amestoy did not create a condition precedent such that any assignment by Amestoy would be void absent the consent of the railway. For this reason, the Auerbachs are not entitled to summary judgment based on Amestoy's failure to obtain the railway's consent to an assignment.

III. ARE THE AUERBACHS BOUND TO INDEMNIFY BNSF?

   A. Are the Auerbachs Bound by the 1981 Agreement's Indemnification Clause?

The Auerbachs argue in their motion that they are not bound by the 1981 agreement because the agreement was not recorded and the Auerbachs thus took free of the encumbrance in accordance with the New Mexico recording statutes. The first issue to address is the nature of the agreement and the applicability of the recording statutes to that agreement.

It appears clear from the face of the 1981 agreement and well established principles of common law that the 1981 agreement was a license. As noted earlier, the agreement specifies that it is a license, specifies that it is personal to Amestoy, and reserves the right of ATSF to revoke the license at any time after 10 days notice. While licenses and easements are sometimes difficult to distinguish, a license grants the licensee a revocable non-assignable privilege to do acts upon the land of the licensor while an easement is a conveyance of an interest in land. See Zotos v. Marketspan Corp., 720 N.Y.S.2d 705 (N.Y.Sup. 2000); Brown v. Rice, 716 So.2d 807 (Fla. App. 1998). Agreements such as the one in this case have been construed as licenses rather than easements. See Puleo v. Bearoff, 103 A.2d 759 (Pa. 1954) (Finding that a railway's grant of

8

permission to defendants to use a private crossing over tracks on condition that crossing be removed at any time after notice and upon defendants' promise to indemnify railway constituted a license rather than an easement).

A license is not an interest in land. Quantum Corp. v. State Taxation and Revenue Dept., 956 P.2d 848, 851 (N.M. App. 1998). This calls into question whether the recording statutes are applicable to the 1981 agreement. It also calls into question whether there was any assignment of the agreement by Amestoy to the Auerbachs.

The New Mexico recording statutes address the recording of "[a]ll deeds, mortgages, leases of an initial term plus option terms in excess of five years, or memoranda of the material terms of such leases, assignments or amendments to such leases, leasehold mortgages, United States patents and other writings affecting the title to real estate." N.M. Stat. Ann. 1978 § 14-9-1. The 1981 agreement in this case is not a deed, mortgage, lease, leasehold mortgage or United States patent. Therefore, the recording statute only applies to the agreement if it is a writing affecting the title to real estate. As already stated, a license is not an interest in land. Because it is revocable, it does not affect the title to real estate. Thus, the 1981 agreement between Amestoy and ATSF was not required to be recorded under Section 14-9-1, and the protections to subsequent purchasers found in Section 14-9-3 are inapplicable.

The fact that the 1981 agreement was not required to be recorded and that the recording statutes are no source of protection to a subsequent purchaser does not mean that a subsequent purchaser is bound by the agreement. Both parties appear to have proceeded under the assumption that, absent the protections of the recording statutes, the provisions of the 1981 agreement would transfer with the transfer of Amestoy's interest in his real property. This is

9

generally true of easements which are conveyed with their dominant estates. See Luevano v. Group One, 779 P.2d 552 (N.M. App. 1989); Kikta v. Hughes, 766 P.2d 321 (N.M. App. 1988); Otis Marshall Farms, Inc. v. Snyder Constr. Co., Inc., 735 N.Y.S.2d 374 (N.Y. Sup. 2001). Licenses, however, are a personal privilege of the licensee. See Chaves v. Torlina, 99 P. 690 (N.M. Terr. 1909); Brown, 716 So.2d 807. As such, they do not run with the land and are not automatically assigned or conveyed by the transfer of the licensee's interest in land adjoining that of the licensor.

Nor may a license be assigned or conveyed. See Chaves v. Torlina, 99 P. 690 (N.M. Terr. 1909); Brown, 716 So.2d 807. This is supported by the general definition of an assignment which is an act or expression of intention by which one person causes a transfer of a right or interest in property. Benton v. Albuquerque Nat. Bank, 701 P.2d 1025, 1030 (N.M. App. 1985). As a license is not an interest or right in property, it cannot be assigned.

The fact that the 1981 agreement between Amestoy and ATSF was a license means that even though the Auerbachs arguably are Amestoy's successors and assigns with regard to the property accessed by the railway crossover, they are not Amestoy's successors and assigns under the 1981 license agreement. Thus, as a matter of law, the Auerbachs are not bound by any of the provisions of the 1981 agreement between Amestoy and ATSF. This is true regardless of whether the Auerbachs had actual, constructive, or other notice of the agreement.

> B. Are the Auerbachs Bound to Indemnify BNSF Based on a New Contract Implied-in-Fact or Implied-in Law?

Even though the 1981 agreement does not bind the Auerbachs, there is the distinct possibility that a new contract should be implied between the parties by which the Auerbachs are

bound to indemnify BNSF. The absence of an express contract between the parties does not foreclose the possibility of a contractual relationship. Smith v. State, 2002 WL 1434403 (Tex. App. 2002). An implied-in-fact contract is based on the parties' mutual assent as manifested by their conduct. Garcia v. Middle Rio Grande Conservancy Dist., 918 P.2d 7, 11.n.1 (N.M. 1996). Mutual intent to contract may be shown by the surrounding circumstances from which an inference may be drawn that the contract exists as a matter of tacit understanding. Huffman v. Kazak Bros., Inc., 2002 WL 549858, 2002-Ohio-1683, (Ohio App. 2002). Conduct from which an implied-in-fact contract may be inferred is not limited to the parties' actions at the beginning of the alleged relationship; parties may manifest their assent to an agreement by their actions over a period of time. In re Compensation of Montez, 28 P.3d 1255 (Or. App. 2001).

BNSF argues that, after receiving the 1990 and/or 1994 proposed crossing agreements from ATSF, the Auerbachs' continued use of the crossover was an acceptance of an offer showing mutual assent to the terms of the proposed crossing agreement including the indemnification provisions.[1] If the 1994 letter is interpreted as an offer by BNSF to the Auerbachs, then a new contract between the parties may be implied if the conduct of the Auerbachs manifests an acceptance of the offer. See Garcia, 918 P.2d at 10. The Auerbachs counter that there can be no finding of acceptance of an offer based on their continued use of the crossing because the 1981 agreement is void as a matter of law. As already explained, the 1981 agreement is not at issue and the status of the 1981 agreement does not preclude the possibility

---

[1] BNSF specifically asserts that this continued use had the effect of maintaining in full force the 1981 agreement. However, as explained above, the 1981 agreement was not in effect at the time the 1994 letter was sent, and the continued use by the Auerbachs did not give the 1981 agreement new life. BNSF cannot and did not make the 1981 agreement binding on the Auerbachs merely by stating that the agreement was binding on them.

11

that the parties entered into a new agreement. The Auerbachs also state that no implied-in-fact contract can be found because there is no consideration and no mutual assent. Specifically, they argue that their failure to respond to ATSF's letters requesting a new crossing agreement cannot be construed as acceptance of the railway's offer.

Acceptance of an offer is a manifestation of assent to the terms of the offer in any manner allowed, invited, or required by the offer. Long v. Allen, 906 P.2d 754 (N.M. App. 1995). Acceptance of an offer must be a manifestation of unconditional agreement to all terms of an offer. Stevenson v. Louis Dreyfus Corp., 811 P.2d 1308 (N.M. 1991). Acceptance must be clear, positive, and unambiguous in order to result in a binding contract. Orcutt v. S & L Paint Contractors, Ltd., 791 P.2d 71 (N.M. App. 1990). Generally, acceptance of an offer need not be formal and an offer may be accepted by performance before revocation. Keeth Gas Co., Inc. v. Jackson Creek Cattle Co., 570 P.2d 918 (N.M. 1977). Failure to reply to a written communication does not ordinarily impose an obligation upon the person receiving the communication. McCoy v. Alsup, 609 P.2d 337 (N.M. App. 1990); see also Garcia v. Middle Rio Grande Conservancy Dist., 664 P.2d 1000, 1005 (N.M. App. 1983) (In order to show a binding contractual agreement, a party must show that mutual agreement was objectively manifested by the parties, and silence is not acceptance of a contract unless there is a duty to speak). However, "[a]n offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable." Walton Commercial Enterprises, Inc. v. Associations, Conventions, Tradeshows, Inc., 593 N.E.2d 64, 66 (Ohio App. 1990).

Restatement of Contracts § 69 states that silence in response to an offer is not acceptance

unless an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation. Additionally, an offeree who does any act inconsistent with the offeror's ownership of offered property is bound in accordance with the offered terms unless they are manifestly unreasonable. Comment e to § 69 states that an offeree's privilege to remain silent without accepting does not extend to acts of ownership not assented to by the offeror. Hence, exercise of dominion, even though not intended as acceptance, is a sufficient manifestation of assent. Additionally, an offeree is not permitted to avoid a contract obligation by asserting that he is a tortfeasor rather than a promissor.

In Russell v. The Texas Company, the court held that a defendant's continued use of a roadway constituted acceptance of an offer of a license to use the road thereby obligating the defendant to pay the plaintiff the rent specified in the plaintiff's offer. 238 F.2d 636, 642 (9th Cir. 1956). Russell was the surface owner of real property. The Texas Company (Company) owned the mineral rights to the same property and to adjacent properties. The Company made use of the surface of Russell's property to extract minerals from that property. Additionally, the Company used the surface of Russell's property in aid of its drilling and extraction operations on adjacent properties. Russell sent the Company an offer for a revocable license to cover the Company's use of the surface for its operations on adjacent properties in exchange for $150 a day. The offer specified that the Company's continued use of the surface to serve adjacent properties would be an acceptance of the offer. The Company did not initially respond to Russell's offer, but continued to use the surface to serve its mineral interests on adjacent properties. More than one month later, the Company expressly rejected Russell's offer and discontinued its use of Russell's

13

surface except as necessary to extract minerals from that property.

The Ninth Circuit affirmed the trial court's determination that the Company owed Russell rent for the time between its receipt of Russell's offer and the time it discontinued the use of Russell's surface to serve its interests in adjacent properties. Id. at 642. The precise holding of the court was that an offeree may not vitiate a contract by a claim of lack of intention to accept an offer when he accepts and retains the benefits offered to him with an affirmative provision in the offer that acceptance of the benefit will, of itself, be deemed acceptance. Id. The court further elucidated that an offeree cannot accept all of the benefits of a contract and then declare that he cannot be held liable for the burdens because he has secretly said "King's Ex." Id. The Ninth Circuit cited the Restatement of Contracts § 69 (then Section 72 of the tentative draft) for support of its holding. Id.

The facts of Russell are distinguishable from the facts of this case. The offeror in Russell expressly provided in the offer that continued use would be acceptance. Further, the court's holding relied, at least in part, on the fact that the offer contained this provision. In our case, neither BNSF nor ATSF sent the Auerbachs a communication that their continued use of the crossover would be deemed an acceptance of the terms of the offered license. I find, however, that the distinctions between Russell and this case are not significant. The Restatement of Contracts § 69 makes clear that a party in the Auerbachs' position who accepts the use of the crossover after being offered a license to do so in exchange for indemnification cannot avoid the indemnification by arguing that their use of the crossover was a trespass rather than an acceptance of the offer of the license.

I find that BNSF's argument that an implied-in-fact contract exists between BNSF and the

14

Auerbachs may have merit.[2]  Thus, I will deny the Auerbachs' Motion for Summary Judgment. Because I decide the motion based on this argument, I need not address BNSF's other arguments in opposition to the motion.

**CONCLUSION**

IT IS THEREFORE ORDERED that Third Party Defendants' Ernest Auerbach and Lisa D. Auerbach's Motion for Summary Judgment [Docket No. 151] is hereby DENIED.

                                                UNITED STATES DISTRICT JUDGE

---

[2]Because this is the Auerbachs' Motion for Summary Judgment, I need not absolutely decide the merits of BNSF's argument that an implied-in-fact contract does exist.